Thank you, Your Honor. We have a lot of N names in these pleadings, and I apologize. If it pleases the Court, my name is Tom Abbott from the law firm of McKenna, Long & Aldridge here in Los Angeles, and we represent the appellant in this matter, Navcom Defense Electronics, who I will refer to as Navcom. I'd like to reserve five minutes of my time for rebuttal, and I will watch my clock. Okay. While this Court has certainly considered many CERCLA cases, and some CERCLA cases which included both CERCLA issues and contract issues, and it seems recently we've had a run on CERCLA cases at the Ninth Circuit, we have one unique aspect to the case that we bring to you this morning. In this case, the district court found that a PRP who was seeking relief for both contract claims and CERCLA 113 claims interfered with and prejudiced the very contract of indemnification on which she relied. Not quite. The footnote says that the negotiation by Gould-Nicot made, I think the term was, more vulnerable, made your position more vulnerable. I was looking at page 22 of your brief, and you take the position that you disagreed with Nico's bargaining position with EPA when Nico offered 36.5 for both Nico, I say Nico to mean Gould-Nicot, Nico, 36.5 for Gould-Nicot. And you didn't agree with that because you thought that your maximum contribution, based on the fact that you'd only been on the property since 1988, was 5%. Okay. But at that point, Nico said to you, well, if you don't like us negotiating for both of us, why don't you join the negotiation as a party soul, right? Now, stop right there. Why didn't that dissolve whatever prejudice, as you style it, vulnerable position as a court styled it? Why didn't you put up or shut up at that point? Understood, Your Honor. First, respectfully, the district court used the words prejudice and interference. Those are not my words. They are in the decision. Second — Because I saw a footnote that said a vulnerable position. The district court also said that it put them in a vulnerable position, Your Honor, but it also — and we cite it in our papers, and I'll give you the cite. It used the phrase interference and it used the phrase prejudice because we had looked for those words. We had argued for those words because that's what triggered the determination. And let me give you the cite in brief. Well, don't use your time looking that up. That's all right, Your Honor. I've got it. In the brief at page 30, we cite to the excerpt of record at page 39, Judge's decision 40739, where the court says, As a result of plaintiff's actions, defendant was prejudiced in its efforts to negotiate its liability for the NAVCOM property. That word prejudice is the word that triggers the case law that the Ninth Circuit has found on the excuse or the voiding of indemnity obligations, which is why we were so anxious to find that. And let me explain why we think that was prejudice, coming back to the negotiation that you were talking about, Your Honor. The parties had gone into, as you all know because you've done circuit cases, we have a number of PRPs who are involved in a negotiation and they're trying to allocate shares to one another. And they bring in experts and they do investigations and they bring in special masters and they try and work out a scenario. NAVCOM, the district court found, had been participating in that process, was heavily engaged in that process. And NAVCOM thought that it had determined what a fair share was for the NAVCOM property. The district court found two things that are important to the question Your Honor asked. First, Gould Niko, who had responsibility for another property in the region, was the only PRP that knew that on their property, what the judge referred to as the padrillo dumping had taken place. The PRPs were all looking at leakage from clarifiers. But on Gould's other property, the Bercher property. That's the Bercher property, right? The Bercher property, correct, Your Honor. There was an individual who testified. He'd gone out for a period of a year to a year and a half. And your theory is that that dumping leached over into the NAVCOM property. That is correct, Your Honor. Okay. We've got that. But the court found, as you said, that there was prejudice and, therefore, normally where an indemnitore, through the actions of his indemnity, suffers prejudice, that changes the terms of the indemnity and, therefore, under surety or contract law, it discharges the indemnitore if the prejudice is material. Correct, Your Honor. The court went further. Pardon me. The court went further and said, but you hadn't pleaded frustration of agreement. So they said, the court said, then we will consider this as a factor, an equitable factor in allocating CERCLA responsibility under the CERCLA contribution statute. Correct, Your Honor. What's wrong with that? Several things, Your Honor, beginning at the beginning of your question. The prejudice is material because in this process that I'm describing for you, NAVCOM gets one chance to sit down with the other PRPs and come up with its share. It wants to contribute a share of 5%. Gould-Nicot comes in and says, no, no, no, PRPs, I'll give you 20%. I'm making these numbers up, but that's the relative merit here. I'll give you 20% for NAVCOM's property. Nobody is going to negotiate with NAVCOM anymore. That 20% was Gould's contribution. It was going to cover both the Bercher property. It's actually 36. Why couldn't you have taken up Gould's offer to negotiate for yourself? Because at that point, Your Honor, my property already has a share. Gould-Nicot has offered the share for my property. But they can't bind you. I agree, Your Honor, and that's the problem that we have here. They can't bind us. So they offer you, say, if you don't like us negotiating for you, come on in, pal, do it yourself. Well, the reality, Your Honor, is the only way, and we found this out in the When anybody starts talking about the reality. I apologize, Your Honor. That means to me my view is. I apologize, Your Honor. There would have been, your scenario could not happen. If NAVCOM had come forward and said, we want to join in at 5% and we want liability protection from all the other PRPs. In other words, Gould-Nicot, you can't come after us. We'll put in our 5%, but just like all the other PRPs who signed the consent decree, we want out. We want to get that contribution protection. Gould-Nicot would never have agreed to that. What Gould-Nicot said and what the court found was, if NAVCOM wanted to put a share in, that was okay. But Gould-Nicot was still going to come after NAVCOM for the difference between what Gould-Nicot had put in and what NAVCOM had put in. On its indemnity agreement as. Absolutely, Your Honor. In the assumption agreement, less $2.5 million. Absolutely, Your Honor. But then you would have had a defense to that contract action in terms of frustration, would you not? No, Your Honor. We would not have had contribution protection under the consent decree because the parties had to agree as a group and they had to agree with the EPA. Gould would not agree with NAVCOM that NAVCOM could be excused from that indemnity obligation. That was the whole problem. They said if you want to put in your 5 percent, that's fine, but I'm going to still come after you. They frustrated our ability, still under that contract of indemnity, to make our arguments to the PRPs, to make our arguments to the EPA, and come up with a binding number that all the parties agreed to. Gould would not allow that to happen. That's in the record. What happens instead and what the motivation was here was Gould, NICO knew it had a big source of contamination on its property from this dumping. It knew that nobody else knew that dumping had taken place. They wanted to cut off those negotiations. They didn't want there to be any more investigation. They wanted it to stop. So they came to the other PRPs and the EPA and said we'll take care of all the properties. Our property, NAVCOM's property, we'll put a big number in. That was a smart business move for Gould, NICO. It cut off the investigation that NAVCOM wanted to conduct to prove that there was this off-site source of contamination. If that information had got into the PRP negotiations, the numbers would have been very different. Gould, NICO would not have allowed the scenario that you're describing. NAVCOM, sure, put in 5 percent and now you're done. It wouldn't have been over. There would have been exactly the same lawsuit. We just had 5 percent already on the table. They'd be suing us for the difference between 5 percent and 36. Gould, NICO didn't say that. According to your brief, page 22, it said Gould, NICO also invited NDE to participate in the proposal to the EPA with other PRPs at whatever percentage NDE chose. As long as NDE agreed that Gould, NICO could still sue NDE on its written indemnity agreement, which said that NDE indemnified Gould, that's $2.5 million, for anything that happened on the property. Why would they give up that contractual right? Your Honor, the reason that they would give up the contractual right is to get a contribution share out of NAVCOM. The deal that NAVCOM was willing to cut in 2001 was, we'll put up a share, but that's it. But then we don't want you to sue us on that written contract. Yes, Your Honor. Oh. Because this is both a CERCLA and a contract case. And we had a disagreement. Counsel, I wanted to ask you. You said your investigation was cut off. Yes, Your Honor. Why couldn't you have continued your investigation? And that would have affected the amount of your contribution ultimately, or at least had that possibility if you could prove the dumping. Your Honor, ultimately the investigation did continue in this lawsuit. But once the parties were assigned their allocation shares, once all the PRPs shook hands with the EPA and the consent decree, all the other PRPs got out. All the other PRPs got what we call contribution protection. Nobody can sue them. Gould can't sue them. I can't sue them. Nobody can sue them. That's what NAVCOM wanted. Once the investigation, in other words, Your Honor, wouldn't have done any good because the shares were assigned. And the only way that the investigation does any good now is in the 113 contribution action between these two PRPs. And that's what happened. What we're arguing to you is that we had a contractual right under that indemnity obligation to control those negotiations for the NAVCOM property. We were deprived of that contractual right. The minute the district court found us, the district court found we were prejudiced and interfered with, we simply could not make a negotiation with the other PRPs because, in effect, Gould and NICO outbid us. Do you claim that any indemnity provision, that any prejudice, however minor, should completely discharge an indemnity provision? Your Honor, the American casualty decision which we cite reads with such language. We certainly believe in this case, though, if you look at the circumstances of the negotiation, there's only one liability, there's only one negotiation, there's only one chance. Gould and NICO comes in and takes over that negotiation. That's what the indemnity's for. If there was an indemnity for another, you know, contamination or an off-site dump or a string fellow kind of thing, we'd have a different issue. But the only issue in this case and the only issue in that indemnity is for this groundwater contamination. And we had one chance to negotiate our share for it. They took that away for us. That, as far as we're concerned, under the law of American casualty and the principle that everybody recognized, wipes out that indemnity obligation. I know of no way to parse it. I know of no way to cut it in half as a matter of law. There is a case, American Case Company v. Idaho, that speaks about cases limit the rule to only discharge the obligation to the extent that a party's conduct is prejudicial. Your Honor, we see that language in many of the circuits. We did not see it in the Ninth Circuit case, American Casualty. But to the extent, we're perfectly fine with that standard. To what extent were we prejudiced? NAVCOM lost its right to defend its contractual indemnity for this contamination, for the circle liability on this site. It lost the whole thing. The whole thing went away. We have one chance to negotiate. We lose that chance. That takes, and the district court found we were prejudiced and interfered with. So to the extent in this case means the entire circle liability for this site, because that's what we were found to have. All right. I'll reserve the rest of my time. Thank you, Your Honor. May it please the Court. Well, you see what we're interested in, don't you? I do, Your Honor. And my name is David Goulder.  And we tried this case down here in the Central District. You'd better speak a little bit louder. Sure. I'm sorry. I'll get closer to the mic. That'll help. My name is David Goulder. This is my partner, David Plount. The first thing I would like to advise the Court is counsel just advised the Court that American Casualty, the Ninth Circuit case it's relying on, doesn't have the language that you're only prejudiced or you only get offset to the extent you're harmed. I'd like to look at Keynote 2. It's page 145 of that opinion, 328F, second half, 145. It says, We hold, therefore, that the conduct of the appellant and its agent in taking for itself and its losses on the Whidbey Island the bit securities in disregard of Robert's rights under his agreement with the joint venturers and the rights which he was assured under the indemnity contract, justified the trial court in holding that, to the extent of the value of those securities, Robert's was released from his obligations under the indemnity agreement. The facts in that case are very clear. There was one single indemnity for the Amarillo, Texas project. The indemnitor was found liable on that project for $1,046,000. The surety, however, had grabbed onto other assets of the original contractors in violation of what the original agreement was with all the assets of the contractors were assigned to the indemnitor. The damage was valued at $380,000, $350,000 in securities and $30,000 in machines and tools, and that exact amount was offset against the total indemnity. I think there's a very strong parallel to what the court did here in the CERCLA context, that he found, in essence, that they were harmed by the equivalent of 9% in reducing the he found the NAFGON site responsible for 66% of all the contamination. Mr. Goulder, please point to me the page and line number where the district court determines that the prejudice which is found to have been caused to NAFCOM by NECO's negotiating tactics is quantified and reduces the amount of indemnity thereby. Well, I would refer the court to footnote 8, where he says, if that's what he refers he's going to. What was that, excuse me? I'm sorry. Footnote 8 on page 21 of his opinion. I believe it's in the excerpt of record. It's ER 407. That's the footnote where he says vulnerable, you made the position vulnerable. Yes. I've read that. Yes. All right. That doesn't tell me. And then you refer. Let me get this. Let me say this as clearly as I can, and perhaps if it's not clear, you can clear it up for me. You're taking the position that in the normal case, if an indemnity interferes and prejudices and changes the obligation of an indemnitor, the indemnitor is normally released from the indemnity, right? No, that is not my position at all. It is released only to the extent. To the extent. So your position is the indemnitor is not released except to the extent that the actions of the indemnity have prejudiced the indemnitor. Correct. Please tell me where the court says that and does some type of allocation of damage. Yes. Page 34 of his opinion. Again, work off the record since that's probably what you have. That would be page 39 at the bottom where the court explains the as a result of plaintiff's action, defendant was prejudiced. And for the next several pages, he goes down and he explains that he started with 66 percent and through page 41 of the excerpt of record. Is that based on the effect of the negotiation? Absolutely. NAVCOM or is it based on the amount of TCE and PCE extracted from the properties? No. I'm sorry. His starting point of 66 percent is based on his determination of how much TCE and PCE was released from each site. Okay. He then goes through the analysis of pages, again, it's ER-407, pages 39 through 41. How does he arrive at the multiplier which takes it down from 66 to 60 percent? I can't do anything more than explain how the court did his analysis. He found some harm in depriving them of their right to negotiate. However, I would put in context several things which I think are helpful. First of all, I want to make clear that Gould never made an offer on behalf of the NAVCOM property alone to the other. Pardon me. If you say that you can't shed any more light than what the court says in its long opinion as to how it got from 66 percent to 60 percent, how do you meet the argument that it did so as an abuse of discretion and with no rational basis? I think, well, his explanation is that there was some harm to them in depriving them of their own ability to negotiate. Right.  Well, if I could refer the court to Exhibit 652, which is an internal memo from Mr. Russo of NDE, who was in charge of the entire RIFS program for five years that conducted the investigation of this entire area, to the CFO of NAVCOM dated June 19, 2001. It states that the interim record of decision for the cleanup is now prepared. Alternative 5 costs $22,670,000. And then it continues. The NAVCOM site is one of the more contaminated sites in El Monte. Accordingly, NAVCOM will be expected to pay for a significant part of the total cost. At this time, NAVCOM's share of that cost could approximate 20 percent, or 4.528 million. This is NAVCOM's own internal document as to their view of how much liability, when it was one single site in East and West, were combined. So your people were saying pay 21 percent. Correct. And we'll pay 15.5 percent, so you're only 1 percent off. Yes. If you use that as an admission of a party litigant that guides the district court. Is it your position that's what guided the district court? It certainly is something that was highlighted in our briefs. I cannot point the Ninth Circuit to a specific reference in the judge's opinion. But it was information that we highlighted, absolutely, because it was so close to what we had done. But I also want to make clear, because I think it was muddled in the opening presentation, we never made to the other PRPs any allocation to the NAVCOM property. We said Gould is responsible for, has liability at three different sites. We'll package that at 36.5 percent, which was before the offer had for the two, the big four proposal that the court discusses. The Bercher and NAVCOM properties had already offered 23 percent, and the negotiations went nowhere. What we then did is we turned to NAVCOM privately and said, of 36 percent, 36.5 percent, we would like you to pay 21 percent. And that's when we learned, oh, no, we're not paying more than 5 percent. I also would like to correct statements concerning the padrola dumping. It is very clear from the record that the, from 1993 on, the southwest corner of the Bercher property was well known to be a highly contaminated source. There were soil gas probes put right on the southwest, the southern border of the Vaughn's property, of the Bercher property, excuse me, where it abuts the Vaughn's property. There were six soil vapor extraction wells installed in the southwest corner of the Bercher property. The reason it was there was not widely known, although the EPA had an interview in its records that Gould never saw until the summer of 2001. We didn't own this property. We'd never owned this property. We just inherited a liability through an acquisition and merger of Hoffman. And in contrast, one of the long-time employees at the NAVCOM site who worked with Mr. Russo knew about the dumping. Kennedy. Well, in the circle, you don't have to be the dumpee or dumpore. Oh, I understand that. But it's just the notion that somehow we hid something, and NAVCOM's explanation of why we made this offer is not something that the Court found. And I pointed that out in the brief. The Court did not accuse us of making an offer to try to hide the Padrola dumping. That is their fiction. It is not a finding of the Court. I don't know if there are more points with respect to the contract issue that the Court's interested in or because I would like to address those. I have a question on the contract issues. Sure. The assumption of agreement and the transactional aspects of that agreement. As I understand the record, Gould created GNCSI as the holding company, and then from that the three totally owned subsidiaries. And GNCSI, the holding company, then contracted with GNSDI, correct? Created that. Yeah. Gould went down to the second tier subsidiary. However, then the assumption agreement was between Gould, not the holding company, but Gould and GNSDI. Is there any legal significance to that? That's exactly who it would be because Gould is the one who owned all the assets and liabilities of the NAVCOM division, and it was the only company that had the power to transfer those assets and liabilities down to the second tier subsidiary. Didn't they transfer that to the holding company? No. No. Absolutely not. They simply created a holding company. And the holding company owned that, then created the GNSDI, the second tier subsidiary, and owned all of the stock. And that's why it's the first tier subsidiary that actually sells the stock under the stock purchase agreement, not Gould. There's three levels, Gould at the top, then the middle tier subsidiary. Gould Systems. Yes, Gould Systems. Because MG and SDI. Right. Right. And there are no assets other than the ownership of the stock, other than the stock of these. Actually, there were three different subsidiaries that were created because there were three different defense businesses that needed to be divested. But NAVCOM or its predecessor, whatever the initials were, that corporation purchased the stock from the GNSDI. Correct. And the assumption agreement was entered into between Gould and GNSDI. Correct. What happened here was the parent company divested itself of a division that it needed to, created the intermediary, then the second tier subsidiaries were created by Gould and NAVCOM Systems. All of the assets and liabilities of the division that were still owned by the parent company were dropped down to the second tier subsidiary. And then the defendant's predecessor bought the stock and only the stock from the company that owned the stock, which was the middle subsidiary. And as in any stock purchase transaction, you get whatever, the company you've acquired, it doesn't affect the assets and liabilities of the company you've acquired. You've purchased 100 percent of the stock. What they then did, which is why they became directly liable, was they did what Gould did repeatedly and ended up holding the bag for Hoffman and Chadwick. They merged the company they'd acquired into themselves. And therefore, every liability of that GNSDI, whose stock they'd acquired in 1988, became their own. So then why does Gould owe anything on the contribution claim? Gould owes. That was the court's analysis. Basically, in the opinion, I can't direct exactly where it is at the moment. But the court says if there was only one site involved in this case, his job would have been done, that NAVCOM would have been liable for 100 percent. But there were two sources, and nobody ever said there weren't two major sources of contamination to the groundwater, the Bercher property, which they did not assume. We still had that because we didn't sell Hoffman's other liabilities. We just sold the liabilities associated with the NAVCOM site itself. We would have loved to have had them say, oh, yeah, we're a successor to Hoffman. We get the Bercher liability, too. But that wasn't – that was not sold. We still retain any liability Hoffman had for the Bercher site, any other sites where it might have operated, any locations where it might have dumped, you know, transferred waste offsite. Do you agree with Mr. Abbott that when the offer was made to NAVCOM, if you don't like us negotiating for you, negotiate yourself, but we're not going to let you off the indemnity agreement, did that mean that NAVCOM couldn't meaningfully negotiate with EPA? I don't see why. Explain that. We had a contractual claim with them. That's entirely distinct from whether we have a contribution claim to them under CERCLA. They could have gotten contribution protection. That was the whole reason we invited them to come back in. They could get protection from every other PRP. Would the protection that they got under the contribution statute of CERCLA have barred your recovery under an indemnity agreement? I don't believe it would have. Because CERCLA itself does not – I believe there's a savings provision that makes clear that CERCLA does not supersede other rights and remedies that may be available. We have a contractual claim. CERCLA is an equitable claim dealing with remediation costs. So why would NAVCOM have gone into negotiations with EPA pursuant to your invitation if they knew that afterwards they had a suit by you on the indemnity agreement? Well, I guess one reason would be the split would be narrower. If they had come in and said, we'll take 15% – and, again, we're surprised because they went in and were negotiating – they made an offer of 11.5% as part of the Big Four proposal, and then they come back to us and say, no, we're only going to pick up 5%. And that's after Mr. Russo acknowledged that he had made an error and omitted the highest groundwater readings, the highest soil vapor readings, and the highest soil contamination readings in the EMU. Do you agree that if they had decided to stay in at the 21% that you were negotiating for them, then you would not have an indemnity action over based on your indemnity agreement? That would have settled indemnity. Assuming that they had accepted Gould's proposal that they come in at 21%, that proposal was intended to try to come up with a final resolution. And it had language in it that would discharge any indemnity agreement? I don't know that it ever got – I don't want to – I can't say that. I don't believe there's anything in the record. The parties never got that far in the discussion, because basically it was, what are you talking about? That's ridiculous. Okay. I had a question about the district court's allocation scheme. Why wasn't it arbitrary to base the scheme almost entirely on the amount of contaminants that were removed from the property? Because that amount, first of all, it wasn't the only thing he did. I do not accept their premise. It was primarily. Primarily. But he also looked at the asymptotic. The issue is you never get it all out. So that's another factor he looked at. He looked at the fact that there's – what they're trying to do is get as much out through the soil vapor extraction system as possible. There is probably DNAPL on both sites. We said there was definitely DNAPL on the NAVCOM site. They said there definitely was DNAPL on the Bercher site. And he didn't go with either of your experts. He just came up with his own scheme. No. And that's what I attempted to – the court, for instance, or rather the court – we had evidence in front of it that explained exactly that this stuff was released – how it was released, how it migrated through the groundwater, how it got to the groundwater, how there was DNAPL, which is pure product, sitting on top of the groundwater and continuing to dissolve into the groundwater. In all of these cases, there is always – or rather, I guess I should say it the other way. There is never absolutely right on information that tells you who put how much in. That's the nature of these cases. The Boeing case, they don't have any idea how much. They have – there's some testimony about how much went in at some point, how much was removed, and then they go on to an entirely different analysis. But how much contaminant went in could be far different from that removed. Sure. But both – these are two sites that are, you know, 100 feet apart. The soils are the same. They're going into the same aquifer. They – if you look at the description of the soil vapor extraction systems, they're virtually identical in Larsen's own – excuse me, in NAVCOM's own experts' opinion. The court – I guess the other thing I would focus on is what the court – the court did not challenge the use of the models by both sides, the entire analysis of how the stuff got down into the soil first, then into the groundwater, and then migrated through the groundwater. What the court did was point out, in criticizing both experts, that a number of the assumptions, the inputs that go into that model, were biased in favor of their own clients. He said, that stagnation point for the Azusa well happens to be located at a very odd place. It basically prevented any southward migration, and I don't buy that. On the other hand, he said – he looks at Larsen, and here's this well that's pumping for 25 years, drawing groundwater north, and Larsen says, no factor. He did what trier-of-the-fact and juries do every day in trial courts, which is to not quite believe the most extreme claims of either of the experts, and take some of the facts and calculate damages based on some of the facts that they believe. I would – yes, that's what I would say. But I would also like to quickly, if I could, indicate that the U.S. v. Burlington Northern case that has been cited is a bizarre case to compare to this one. Your time's up, counsel. I'm sorry. Okay. I've kept you. Thank you. I just rely on the brief for that. I just wanted to point out, in Burlington, the en banc court has amended its opinion. I assume that that is within your knowledge. Actually, I confess my ignorance. All right. I didn't get a 28-J letter on that, but the en banc court did amend its opinion. Thank you, Your Honor. A couple of points, going back to where we left off and where you began with the FLE, Your Honor. The answer to your question, what would have happened and how did the district court use that prejudice in moving from 66 percent to 60 percent, is actually answered at excerpt of record in the court's decision, page 40, 407.40. And it answers many of the questions, I think, Your Honor, that you have raised. The court said, as a result of plaintiff's actions, defendant was prejudiced in its efforts to negotiate its liability for the NAVCOM property with the PRPs on its own behalf and enter into the consent decree with the EPA, with an allocation that was acceptable to defendant. After plaintiff made its offer of 36.5 percent, defendant was unable to successfully negotiate with the other PRPs unless it agreed to a number in excess of that which the plaintiff had offered. Clearly, this was not a realistic possibility as the defendant believed its share to be less than what plaintiff already offered. Thus, defendant was left with the unenviable choice of either accepting the 21 percent share that plaintiff insisted upon and sign the consent decree or terminate its efforts with respect to the consent decree process and wait for the plaintiff to file suit. The court goes on to say, plaintiff does not and cannot know what would have happened if defendant had been allowed to negotiate on its own behalf. That's why this has to be a total void of the indemnity obligation. We can never know what would have happened and what NAVCOM would have been able to do if it had been allowed to negotiate its own liability. NAVCOM had learned since the time of the memo that you were referring to. But that's exactly what the trial court did. It said, I am now going to allocate the amount of prejudice that was caused to NAVCOM and reduce from 66 to 60. And he did it as an equitable factor, Your Honor, somehow with no rationale. What he didn't do is consider it as a legal affirmative defense. He said in his footnote at footnote 8, I will not consider this as an affirmative defense because you hadn't put it in your answer as frustration of performance. Your Honor, there is no such thing as frustration of performance as an affirmative defense. We pled estoppel. We pled unclean hands. We pled breach of the covenant of good faith and fair dealing. And the precedents of this circuit are very clear. It doesn't matter what the name of the affirmative defense is. That argument was in the pretrial briefs. It was in the pretrial order. It was extensively argued at the trial for a day. We had a big donnybrook over whether there was prejudice, whether there was interference, and the court found in our favor. But he made a clear error of law by refusing to consider it because the name, he felt, was not the right name in the answer. This circuit has reversed that every time it's seen that question. Ginsburg. Let me ask you, I want to ask you a question about Burlington. On Burlington. Your brief relied in part on Burlington. But the Ombop panel has since amended that opinion to note the difference between apportionment and contribution. Does that change your argument at all? No, Your Honor. It doesn't. Because in some instances, and this Court recognized it in the very Boeing case, the Boeing case was a CERCLA 113 case. It relied on the Fifth Circuit's Bell case, which was a 107, for what is now the standard in the Ninth Circuit. It quoted exactly the standard out of the 107 Bell case that there has to be a reasonable basis. And all the Court said in Burlington was there had to be a reasonable basis. So we were doing, by citing Burlington, we were doing just what the Ninth Circuit had done in the Boeing case when it cited Bell. For some of the equitable factors, and in fact, in the Sixth Circuit In re Township case, they went and looked at this very question very carefully, Your Honor, and they compared them to the 107 divisibility analysis. And they said, you know what? Some of those factors under 113 are the same things we look at in the 107 analysis. For example, the divisibility of the harm. Who contributed? Who put the contamination in the ground? It's exactly the same. And that's all that the Court's doing, and that's all we're doing. That's all the Court was doing in Boeing. We're simply saying for the purpose of establishing what constitutes a reasonable basis for that allocation. You have to have a reasonable basis. That's what the Boeing case said. Burlington ordinance simply says the same thing. So I'm familiar with the decision, Your Honor, and it doesn't change that holding at all. What we have here is a situation, to come back to the allocation scheme, where the district court relied entirely. Your Honor was exactly correct. He first found, the experts said, I can't determine groundwater liability based on the SVE analysis. It's not determinable. He said, I can't determine it. He then went and determined that 66 percent factor Your Honor talked about entirely and completely on the SVE analysis. He said, neither expert provided me with a basis to determine allocation. He criticized the experts to death. Unlike the Boeing case, where if we go down to the district court level, the court said, these experts are great. They mostly agree. One's at 80-20. One's at 70-30. They used exactly the same analysis. He discounted the experts completely. So when he says, I'm weighing the experts with my idea to use the SVE analysis, he gave the experts zero weight. He gave that SVE analysis 100 percent weight. And it makes no sense, Your Honor, to rely on that SVE analysis. That's how much we took out of the ground. That doesn't tell me how much made the groundwater. The guy who took more out of the ground may have less that got to the groundwater. The district court decided the opposite.  It's not reasonable. Thank you, Your Honor. Thank you very much for a very good presentation of both counsel. And the matter will be marked as submitted. And that ends our calendar of arguments this morning. The court will stand adjourned.
judges: Nelson, Bea, Rosenblatt